Argued and submitted January 25, vacated and remanded for entry of judgment of one conviction for attempted aggravated murder as to each victim, and resentencing; otherwise affirmed November 7, 2007, petition for review denied February 20, 2008 (344 Or 194)

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# RAFAEL GONZALES-GUTIERREZ,
aka Rafael Gutierrez Gonzalez,
*Defendant-Appellant.*

## Multnomah County Circuit Court
030934393; A125633

171 P3d 384

Daniel J. Casey argued the cause and filed the brief for appellant.

Janet A. Klapstein argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Deits, Judge pro tempore.

WOLLHEIM, J.

## WOLLHEIM, J.

Defendant appeals several convictions arising out of a murder-for-hire plot that he initiated from the county jail while awaiting trial on separate charges. He assigns error to several of the trial court's rulings; we write to address only four of those assignments and reject the remainder without discussion. Pursuant to those four assignments, defendant contends that the trial court erred (1) in failing to provide contemporaneous interpretations of two English-language recordings that were played at trial, (2) in allowing a Spanish-speaking police officer to testify about the contents of Spanish-language telephone calls that defendant made from jail, without playing the recordings at trial, (3) in entering a judgment of conviction for two counts of solicitation to commit *aggravated* murder when the indictment, pursuant to those counts, charged defendant with solicitation to commit *murder*, and (4) in failing to merge several of defendant's convictions. We reject defendant's claims that the trial court erred in the first and second respects, but agree with his challenges to the form and content of the judgment. Accordingly, we vacate and remand for entry of a corrected judgment and resentencing, but otherwise affirm.

The relevant facts are undisputed. After receiving a tip from a jailhouse informant, police learned that defendant was attempting to arrange for the murder of B, the victim in the charges on which defendant was awaiting trial, and D, a former acquaintance. The informant facilitated several telephone calls between defendant and Bobby, an undercover police officer posing as a hired hit man. Ultimately, defendant arranged for his relatives to deliver a gun and $3,000 to Bobby. In return, Bobby provided defendant's relatives with a police-staged photograph ostensibly showing B dead. Defendant was indicted and, after a bench trial, was convicted of three counts of attempted aggravated murder, ORS 163.095, three counts of conspiracy to commit aggravated murder, ORS 161.450, three counts of solicitation to commit aggravated murder, ORS 161.435, two counts of attempted murder, ORS 163.115, and two counts of conspiracy to

commit murder, ORS 161.450. The court imposed concurrent sentences totaling 120 months' imprisonment.[1]

At trial, the state relied on several recorded telephone calls in which defendant arranged for the murders. Some of the calls were conducted in English, and others in Spanish. In the calls, defendant spoke both English and Spanish, although he predominantly speaks Spanish. For that reason, the court appointed interpreters to interpret the court proceedings into Spanish for defendant.

We discuss in detail below the specific facts relating to each of the four assignments of error that we address. We begin with defendant's first assignment of error, which pertains to the English-language telephone calls. We then turn to defendant's second assignment of error, which pertains to the Spanish-language telephone calls. Lastly, we address defendant's challenges to the form and content of the judgment.

## ENGLISH-LANGUAGE TELEPHONE CALLS

At trial, the state offered recordings of four English-language telephone calls: three that originated from the jail and involved defendant, the informant, and Bobby, and one that originated from outside the jail and involved Rafael Lemus, defendant's nephew and a codefendant, and Bobby. Initially, the state played recordings of two of the calls and provided the court with unofficial transcripts to aid in understanding the recordings. While the recordings were played, a court-appointed interpreter interpreted them into Spanish for defendant.

Later in the proceedings, the state offered recordings of the remaining two English-language calls. Before the state played those recordings, the interpreters informed the court that a "sight interpretation simultaneously with a recorded conversation" was inconsistent with their job duties. On that basis, the court confirmed that defendant had a right to have the recordings interpreted, but elected to play them initially without a contemporaneous interpretation. The court stated:

---

[1] The charges on which defendant was initially incarcerated when he initiated the murders for hire were tried in a joint trial with the charges at issue here. However, defendant's convictions on those charges are not at issue in this appeal.

"I'm going to go ahead and play [the tapes] in English. I think that the defendant[ ] [is] entitled to [hear] it in Spanish, and I intend to get that addressed before we get to the end of all of this.

"But I didn't think that it needs to * * * happen this very instant."

The court then explained its decision to defendant:

"[A]s you may have understood when you were listening to the last tape being played, it's very difficult for the interpreters to keep up with the tape, even with the assistance of a written transcript, and sort of get it all into Spanish in an accurate way.

"It is so difficult that their guidelines for their job, I am told, forbid them from doing that kind of thing; in other words, they're here to take live testimony and interpret it for people who are listening to i[t] at the same time.

"The situation that allows them if they don't understand something to ask, did you mean this or did you mean that? That's not something that I can do listening to a tape recording. So their rules, I'm told, forbid them to engage in the kinds of things they [tried] to do for us with those last two tapes, so you're not going to hear this next tape interpreted into Spanish.

"Now, that doesn't mean you don't have a right to know who's in the tape. And at some point in this trial—I hope tomorrow morning—we're going to have a discussion about what that really means in terms of what you get day by day in the trial. I don't know the answer to that right now.

"For the moment, however, you are simply listening to English in the tape or whatever language things are on in the tape, and relying on your lawyers to help you deal with it. So I apologize. It's not the way I would like to have it, but it seems to be where we are at this moment."

The state played the recordings without contemporaneous interpretations, and defendant objected on due process grounds.

The following morning, the Program Manager for Court Interpreter Services appeared in court and clarified that the interpreters were permitted to contemporaneously interpret recorded conversations, but he stressed that

"[w]hen there are English recordings being played with a transcript included, the interpreters will not be interpreting the recording or trying to make any judgment call on what that says. They'll be simply [sight] translating the transcript." With the duties of the interpreters clarified, the court replayed the two English-language recordings, and an interpreter contemporaneously translated the unofficial transcripts for defendant.

On appeal, defendant renews his argument that the trial court erred in playing the two English-language recordings without contemporaneous interpretations, in violation of his statutory and constitutional rights to an interpreter. The state disagrees and contends that there is no statutory or constitutional requirement that the recordings be contemporaneously interpreted and that the measures that the trial court took to ensure that the recordings were ultimately interpreted were sufficient to protect defendant's right to comprehend the evidence and to meaningfully participate in his own defense. We agree with the state.

We begin with defendant's claim that he was entitled to a contemporaneous interpretation pursuant to Oregon's interpreter statute. ORS 45.275(1)(a) requires a court to "appoint a qualified interpreter in a civil or criminal proceeding" whenever it is necessary to "interpret the proceedings to a non-English-speaking party." Although ORS 45.275(1)(a) grants a statutory right to an interpreter in the circumstances described by the statute, it does not provide any indication as to when and how that interpretation must occur. However, defendant argues that, when ORS 45.275(1)(a) is read in context with ORS 45.273(1), the statutory scheme requires the interpretation of proceedings to a non-English-speaking party to occur *contemporaneously with the state's presentation of that evidence.*" (Emphasis in original.) ORS 45.273(1) provides the legislature's declaration that it is "the policy of this state to secure the constitutional rights and other rights of persons who are unable to readily understand or communicate in the English language * * * and who as a result cannot be fully protected in administrative and court proceedings unless qualified interpreters are able to provide assistance."

■■ We are not persuaded by defendant's argument that ORS 45.275(1)(a) requires a contemporaneous interpretation of a recording as it is played in court. Although ORS 45.275(1)(a) requires the court to appoint an interpreter to interpret the proceedings to a defendant, there is no indication in the text of the statute, or its context, that the legislature intended to require the interpretation of a recording to occur contemporaneously in all instances. Here, the court complied with ORS 45.275(1)(a) by appointing interpreters to interpret the court proceedings for defendant. Because we do not read ORS 45.275(1)(a) to always require a contemporaneous interpretation of a recording, we conclude that the trial court's decision to replay the recordings and to have an interpreter contemporaneously interpret them at that time was sufficient to satisfy defendant's statutory right to an interpreter.

Next, defendant contends that the Due Process Clause, as interpreted in *United States ex rel Negron v. State of New York*, 434 F2d 386 (2nd Cir 1970), required the court to have the recordings contemporaneously interpreted.[2] The court in *Negron* held that the failure to adequately interpret the court proceedings to the defendant in his murder trial rendered the trial constitutionally infirm. *Id.* at 387. There, the defendant did not speak or understand English, and the court provided only "spasmodic and irregular" interpretation of the trial proceedings. *Id.* at 388. In fact, the court did not provide any contemporaneous interpretation of the English testimony to the defendant; instead, an interpreter summarized the English testimony for the defendant during two brief recesses, lasting from 10 to 20 minutes each. *Id.* The court in *Negron* relied on "[c]onsiderations of fairness, the integrity of the fact-finding process, and the potency of our adversary system of justice" in concluding that the lack of adequate interpretation was unconstitutional. *Id.* at 389. The court stated that the defendant had a constitutional right to "understand the precise nature of the testimony against him *during that period of the trial's progress when the state chose to bring it forth.*" *Id.* at 389-90 (emphasis added).

---

[2] The Due Process Clause of the Fourteenth Amendment provides, in part, that "[n]o State shall * * * deprive any person of life, liberty, or property, without due process of law[.]"

■ Here, defendant argues that, as interpreted in *Negron*, the Due Process Clause required the court to contemporaneously interpret the English-language recordings when they were initially played in court. We disagree. The quality and extent of interpreter services provided in *Negron* was vastly different from the quality and extent of those services in this case. In *Negron*, there was virtually no interpretation of the proceedings for the defendant, whereas here, interpreters did contemporaneously interpret the proceedings for defendant. The only exceptions were the two English-language recordings at issue here, which were eventually interpreted from the written transcripts two days after the state initially played them for the court. Additionally, we do not read *Negron* to impose a rigid rule, as defendant suggests, requiring a contemporaneous interpretation of all court proceedings. Even if the Second Circuit's decision in *Negron* did stand for the proposition that defendant suggests, it is persuasive at best but not controlling. The trial court did not violate defendant's constitutional rights by initially playing the English-language recordings at trial without a contemporaneous interpretation. *See U. S. v. Long*, 301 F3d 1095, 1105 (9th Cir 2002), *cert den*, 537 US 1216 (2003) (Although interpreters are generally required to provide "continuous word-for-word translation, occasional lapses * * * will not necessarily contravene a defendant's constitutional rights.").

Additionally, we are not persuaded by defendant's arguments that he was prejudiced by the lack of contemporaneous interpretation of the English-language recordings when the state initially played them for the court. Defendant argues, without elaboration, that, because the interpretation of the recordings occurred a day after the police officer who laid the foundation for the admission of the recordings had finished testifying, defendant was "denied the opportunity to assist his counsel in cross-examining that witness." However, defendant does not specify how the cross-examination of the officer would have differed or how he would have assisted counsel in that regard.

■ Defendant also points to minor discrepancies between the unofficial transcripts and the recordings as grounds for prejudice. Defendant argues that, because the

unofficial transcripts, and not the recordings were ultimately translated, the trial court's failure to provide a contemporaneous interpretation of the recordings was not cured or harmless. After reviewing the record, we agree with defendant that there are a few differences between the transcripts of the two English-language recordings at issue here and the recordings; however, given the nature of the transcription errors, we are not persuaded that those differences affected defendant's substantive rights.[3] For those reasons, we conclude that the trial court did not err in initially playing the recordings without contemporaneous interpretations.

## SPANISH-LANGUAGE TELEPHONE CALLS

■ In his second assignment of error, defendant contends that the trial court erred in allowing a Spanish-speaking police officer to summarize Spanish-language telephone calls that defendant made from jail to his relatives, without requiring the state to play the recordings of those calls at trial. He argues that, instead of allowing the officer to summarize the calls, it was necessary for the court to appoint a court-certified interpreter, pursuant to ORS 45.275(1)(c), to interpret the recordings for the court.[4] In response, the state contends that the statutes governing interpreters do not apply to the officer's testimony because he was not acting as an interpreter for defendant or for the court. We conclude that the trial court did not err in allowing the officer's testimony.

At trial, the state called police detective Grandjean. Grandjean speaks both Spanish and English. Although Grandjean testified that he regularly translates for law enforcement agencies, he is not a court-certified interpreter.

---

[3] Defendant identifies three errors in the transcripts of the English language recordings at issue. First, the transcript states, "Bobby: Who's calling ([u]nintelligible)," and in the recording, as defendant correctly identifies, the unintelligible statement is actually "Jerry." Second, the transcript indicates that defendant stated, "I have to call my * * * friend," but the recorded statement was "I *tried* to call my friend." Third, the transcript indicates that the informant stated, "([u]nintelligible) you the envelope," but the recorded statement was "brings you the envelope."

[4] ORS 45.275(1)(c) requires the court to appoint a qualified interpreter in a civil or criminal proceeding when it is necessary to "assist the court, agency or hearing officer in performing the duties and responsibilities of the court, agency or hearing officer."

Approximately two weeks prior to trial, the district attorney's office asked Grandjean to review recordings of several Spanish-language telephone calls that were intercepted by the telephone recording system at the jail. At trial, Grandjean summarized the contents of four of those calls. Defendant objected on the grounds that Grandjean was not a court-certified interpreter and that "this is [Grandjean's] summary, which is basically his opinion as to what's relevant, as opposed to an actual transcript." The court allowed Grandjean's testimony without requiring the state to play the Spanish-language recordings on the ground that defense counsel had a copy of the recordings prior to trial and thus "had an opportunity to review them with [defendant] or will take an opportunity to review them with [defendant] if [defendant is] going to testify about what's on those tapes." However, the court made clear that it was "going to make sure the defense has an opportunity, if they want to take it, to offer a competing interpretation of those calls."

On this record, the trial court did not err in allowing Grandjean to summarize the Spanish-language recordings. To the extent that defendant disagreed with Grandjean's summary, he had several opportunities to challenge it. First, defendant could have challenged Grandjean's summary through cross-examination; however, defendant's counsel did not ask Grandjean any questions on cross-examination. Second, defendant could have offered the actual recordings into evidence, as the trial court invited him to do. The court advised defendant that, if he decided that there is "some reason I should hear [them] in Spanish, I'll listen to them." Defendant did not offer the recordings. Third, defendant could have called his own witness to offer a competing summary of the recordings. Fourth, defendant could have offered a transcript of the recordings translated into English by a court-certified interpreter. Ultimately, defendant chose to challenge Grandjean's summary by taking the stand and giving a detailed exculpatory explanation of the content of the recordings. Basically, defendant testified that the conversations pertained to arrangements for legitimate vehicle-related transactions and not for the murders. On this record, the trial court did not err in allowing Grandjean's testimony.

Alternatively, defendant argues that Grandjean's testimony constitutes inadmissible hearsay, because it "recounted conversations that occurred between defendant and others *out-of-court*" and the statements were offered for the truth of the matter asserted. (Emphasis in original.) *See* OEC 801(3) (defining hearsay). The parties agree that Grandjean's testimony regarding defendant's statements constitutes party admissions and, accordingly, is not hearsay, OEC 801(4)(b)(A). The parties also agree that Grandjean's testimony regarding the codefendant's statements constitutes coconspirator admissions and is not hearsay, OEC 801(4)(b)(E). Thus, the dispute regarding Grandjean's testimony is quite narrow: whether Grandjean's testimony regarding the statements made by other nonparty participants in the calls constitutes inadmissible hearsay. Accordingly, we focus our analysis on those statements.

The focus of Grandjean's testimony regarding the recordings of the Spanish-language calls was defendant's own statements and not the statements of the other participants. In the few instances where Grandjean referred to statements in the recordings that were made by persons other than defendant or a codefendant, the statements were insignificant. For example, Grandjean testified that, in one call, defendant's relative "greets him, asks how he's doing, and says she's here with Poncho." Grandjean testified that, in another call, the person confirmed a phone number and asked defendant, "Do you want me to get Rafael?" In another instance, Grandjean testified that, when defendant asked the person where his codefendants were, she replied, "Well, they're where you are."[5]

■    Assuming, without deciding, that the statements by nonparties constitute inadmissible hearsay, we conclude that the error, if any, in admitting them was harmless in light of the nature of the statements. Evidentiary error is not presumed to be prejudicial, and the burden is on a defendant who appeals his conviction to show that a court's error

---

[5] Defendant does not refer to any specific statement by a nonparty. Rather, he argues that, without the nonparties' statements, defendant's and the codefendants' admissions do not make sense.

affected a substantial right. *See* Or Const, Art VII (Amended), § 3; OEC 103(1). If there is little likelihood that the error affected the jury's verdict, then the evidentiary error is harmless. *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). Here, Grandjean's testimony regarding statements made by a person other than defendant or a codefendant had little, if anything, to do with the charges against defendant. It appears that Grandjean testified to those statements only to provide context for defendant's own statements in the recordings. The admission of those statements had little, if any, likelihood of affecting the verdict. Accordingly, any error by the trial court in allowing Grandjean's testimony summarizing the Spanish language calls was harmless.[6]

## FORM AND CONTENT OF THE JUDGMENT

■■ We turn to defendant's challenges to the form and content of the judgment. First, defendant contends that the judgment erroneously states that, pursuant to Counts 8 and 13 of the indictment, he was convicted of solicitation to commit *aggravated* murder, when those counts actually charged defendant with solicitation to commit *murder*. The state concedes that the judgment inaccurately describes the offenses in Counts 8 and 13, and that the error warrants correction. Second, defendant contends that the trial court erred in failing to merge several of the convictions. The state concedes that the trial court should have merged the convictions into a single conviction for each of the two victims. Defendant's challenges to the form and content of the judgment are unpreserved; however, defendant urges this court to review them as error apparent on the face of the record under ORAP 5.45(1). The state concedes that the judgment warrants correction; we agree and accept the state's concession. *See Ailes v. Portland Meadows, Inc.*, 312 Or 376, 381-82, 823 P2d 956 (1991) (explaining plain error analysis). Moreover,

---

[6] This case presents a different hearsay issue from the issue we addressed in *State v. Rodriguez-Castillo*, 210 Or App 479, 151 P3d 931, *rev allowed*, 342 Or 727 (2007). In *Rodriguez-Castillo*, the hearsay objection involved two levels of hearsay: the Spanish-speaking victim's statements to an interpreter and the interpreter's interpretation of those statements, which the testifying witness then recounted. *Id.* at 488. Here, Grandjean testified about his own interpretation of the calls and not about an interpretation communicated to him through a third party.

considering the gravity of the errors, we exercise our discretion to review and correct them.

To aid in understanding our detailed discussion of how defendant's convictions merge, we start with a brief summary of those convictions. With respect to offenses against B, defendant was convicted of two counts of attempted aggravated murder (Counts 1 and 3), two counts of conspiracy to commit aggravated murder (Counts 2 and 4), one count of solicitation to commit aggravated murder (Count 5), one count of attempted murder (Count 6), one count of conspiracy to commit murder (Count 7), and one count of solicitation to commit murder (Count 8).[7] With respect to offenses against D, defendant was convicted of one count of attempted aggravated murder (Count 9), one count of conspiracy to commit aggravated murder (Count 10), one count of attempted murder (Count 11), one count of conspiracy to commit murder (Count 12), and one count of solicitation to commit murder (Count 13).

■■■ As a preliminary matter, defendant's convictions on multiple counts of an offense based on different theories of committing that offense, but concerning the same victim, merge into a single conviction for each offense. Specifically, defendant was convicted of two counts of attempted aggravated murder of B, pursuant to Counts 1 and 3, based on two separate theories: murder for hire and murder of a witness. Those two counts of attempted aggravated murder merge into a single conviction. *State v. Barrett*, 331 Or 27, 10 P3d 901 (2000); *see also State v. Beason*, 170 Or App 414, 12 P3d 560 (2000), *rev den*, 331 Or 692 (2001) (concluding that, when a defendant is convicted of multiple counts of murder based on different theories of killing the same victim, the convictions should merge). Likewise, defendant's two convictions for conspiracy to commit aggravated murder of B, pursuant to Counts 2 and 4, based on the separate theories, must also merge into a single conviction.

■■ Next, defendant's convictions for inchoate offenses meant to culminate in the commission of the same crime merge pursuant to ORS 161.485(2), which provides:

---

[7] Our recitation of defendant's convictions assumes that the trial court will have corrected the judgment with respect to Counts 8 and 13 as discussed above.

"A person shall not be convicted of more than one offense defined by ORS 161.405 [attempt], 161.435 [solicitation] and 161.450 [conspiracy] for conduct designed to commit or to culminate in commission of the same crime."

ORS 161.485(2) prohibits a court from convicting a defendant for more than one inchoate offense, as defined in the statute, if the defendant's conduct, if completed, would have resulted in the commission of a single crime. However, ORS 161.067(2) provides, in part, that, "[w]hen the same conduct or criminal episode * * * involves two or more victims, there are as many separately punishable offenses as there are victims."

■ Here, all of defendant's convictions are inchoate crimes defined in ORS 161.485(2), that is, all of his convictions involve either an attempted crime, ORS 161.405, solicitation, ORS 161.435, or conspiracy, ORS 161.450. Pursuant to ORS 161.485(2), defendant's convictions for attempted aggravated murder (Count 1), conspiracy to commit aggravated murder (Count 2), and solicitation to commit aggravated murder (Count 5) of B, merge into a single conviction of attempted aggravated murder, because those offenses were designed to culminate in the commission of a single crime— aggravated murder. Likewise, defendant's convictions for attempted murder (Count 6), conspiracy to commit murder (Count 7), and solicitation to commit murder (Count 8) of B merge into a single conviction of attempted murder. As a result, at this point in our analysis, defendant will have one conviction for attempted aggravated murder of B and one conviction for attempted murder of B.

■ ORS 161.485(2) similarly applies to defendant's convictions for offenses against D. Defendant's convictions for attempted aggravated murder (Count 9) and conspiracy to commit aggravated murder (Count 10) of D merge into a single conviction for attempted aggravated murder. And defendant's convictions for attempted murder (Count 11), conspiracy to commit murder (Count 12), and solicitation to commit murder (Count 13) of D merge into a single conviction for attempted murder pursuant to ORS 161.485(2).

To be clear, at this point of our analysis, defendant's 13 convictions have merged into four convictions: two counts

of attempted aggravated murder and two counts of attempted murder.

However, that does not end our analysis, because defendant's attempted murder conviction for each victim merges into his attempted aggravated murder conviction for that victim. *State v. Walraven*, 214 Or App 645, 654, 167 P3d 1003 (2007) (concluding that murder convictions merge into aggravated murder convictions under *Barrett*, because murder does not require proof of an element that aggravated murder does not).

In conclusion, defendant's convictions based on his conduct involving B ultimately merge into one conviction for attempted aggravated murder and his conduct involving D ultimately merge into a second conviction for attempted aggravated murder, with the judgment reflecting the separate offenses subsumed into each of those attempted aggravated murder convictions.

Vacated and remanded for entry of judgment of one conviction for attempted aggravated murder as to each victim, and resentencing; otherwise affirmed.