Argued and submitted April 29, 2014, affirmed September 30, 2015, petition for review allowed May 18, 2016 (359 Or 527)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SHAWN EDWIN HAUGEN,
*Defendant-Appellant.*

Josephine County Circuit Court
10CR0636; A151535

360 P3d 560

Neil F. Byl, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Tiffany Keast, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Garrett, Judge.

GARRETT, J.

## GARRETT, J.

After a jury trial, defendant was convicted of one count of third-degree assault, ORS 163.165. On appeal, defendant assigns error to the trial court's denial of his (1) motion to suppress the victim's eyewitness identification; and (2) motions *in limine* to exclude evidence that the state introduced to show that defendant was motivated to commit the assault by his membership in a motorcycle gang. We conclude that the trial court did not err, and we affirm the judgment.

## I. BACKGROUND

The victim went to a bar in Grants Pass. When he arrived, he observed approximately six people whom he believed, based on their attire, to be members of the Vagos motorcycle gang. The group was wearing shirts, vests, and jackets that bore the Vagos "color"—green—and assorted Vagos logos. One of the group's members, Rives, approached the victim and asked if he knew a man named Moore. The victim answered yes. Rives began "ranting and raving," calling Moore "a snitch" and "a low life," and saying that Moore didn't "deserve to live."[1] The victim also overheard some members of the group teasing another member—whom the victim later identified as defendant—about being a used car salesman. Two hours later, the victim got up to leave. On the way out, he saw the man, later identified as defendant, standing near the door. As the victim passed, the man said, "Have a good fucking night." Then the victim saw Rives, who asked, "Are you here to kick us out?" The victim said that he was just going to his car. The man by the door touched the victim on the shoulder and said, "Well, walk to your car." The victim replied, "Okay," and began walking. The victim was then punched in the side of the head and fell to the ground, where he was then kicked "in the chest or shoulder." While trying to get up, the victim was struck in the head with what he thought was a hammer, nearly knocking him unconscious. The victim was able to reach his truck and drive home.

---

[1] The record reflects that Moore was a former member of the Vagos who became a witness against other Vagos members in a prosecution several years earlier and was later regarded as a "snitch" by Vagos members.

At home, the victim called 9-1-1 and told the dispatcher that he had been punched and "blind-sided" as he left the bar. The victim declined an ambulance, but Officer Nicklason came to his home to interview him. The victim, in pain from his head injuries, was unable to provide any information to Nicklason about his assailants other than that they were Vagos members.

Five days later, Detective Brown interviewed the victim. The interview was recorded and played for the jury at trial. According to the transcript, the victim told Brown that the men who assaulted him were "definitely Vagos" who were "flying their colors" and "had Vagos on their jackets." The victim described the man who punched and kicked him as a "great big stout guy," approximately 230 pounds, "not fat," in his late 20s or early 30s, and was the same man who was being teased for being a used car salesman. He described the second assailant as a "little fat guy," a "little, fat puke," "probably in his 40s," with a "long ponytail." Brown asked the victim if the "big guy" was "pretty buff," and the victim said that he was. Brown then said, "I think I know who you're talking about." Brown did not know that defendant was a used car salesman, and he testified that he actually suspected a different person of the assault at the time of the interview.

Brown told the victim, "I'll show you some photographs" that "maybe * * * will help us—once we have some photos we can go through" and "we'll identify * * * who the little fat guy is[.]" Brown also explained that, "[t]ypically, we just have like six small photographs, but because there's so many people involved in this I'm just going to show you a group of photographs." Brown then administered a photo lineup, which began with these instructions to the victim:

> "You're about to be shown some photographs. Just because the police officer is showing you these photos, you are in no way obligated to identify anybody, okay? The person who committed the crime may or may not be in this group of photographs. Study the photos carefully before you make any comments or make any decisions.
>
> "And if you select somebody we'll do a process, and in this case what I'll probably do is pull the picture out, I'll

have you sign, initial it, and then we'll kind of go through the descriptors and stuff like that so that you and I are on the same page."

Brown then showed the victim a series of 23 photos in sequential order that were taken from a binder containing Department of Motor Vehicles (DMV) photos of known Vagos gang members.[2] The photos did not include any notes or names. The victim saw a photo of defendant and said, "This sure looks like the guy that hit me right here." The victim continued, "he hit me—he kicked me and hit me, I'm pretty sure it was him." Brown responded, "[W]e'll just call him 'White Boy' for now. * * * [W]e'll set him aside." The victim also identified Rives as the "little fat man." The victim told Brown that he was 80 percent sure that defendant and Rives were his assailants. Brown also provided occasional feedback regarding individuals in the photographs, including some of their gang names, true names, and additional information:

"[THE VICTIM]:   I think this guy was one of the ones that was scooped up before, I believe.

"BROWN:   Yeah, that is—

"[THE VICTIM]:   He's a good man.

"BROWN:   Mr. Jorgensen? Yeah.

"[THE VICTIM]:   Chris Jorgensen. I recognize him. This chap was there. They were calling him Ronnie.

"BROWN:   That's because his name is Ron Godwin.

"[THE VICTIM]:   Okay, yeah.

"BROWN:   So he was present?

"[THE VICTIM]:   He was, in fact, present. I can't say that he was involved in the assault. If he was, I didn't see it, but he was—

"BROWN:   So you don't—was he present outside during the assault?

---

[2] At trial, Brown explained that he did not have enough information on potential suspects to administer a "six-pack" lineup, *i.e.*, a series of six photos of persons with similar physical appearances, so he instead administered a sequential lineup.

"[THE VICTIM]:  I didn't see him, no.

"BROWN:  Okay. Okay, fair enough."

The victim asked Brown how old the photos were, and Brown replied that some of them were "a couple" years old. Brown showed the victim more recent photographs of defendant and Rives and told the victim that the photos would "maybe * * * help a little bit" because there were "some significant differences" between the photos. After viewing the more recent photos, the victim said that he was 90 percent certain that defendant was the one who had punched and kicked him.

Defendant was charged with one count of third-degree assault, ORS 163.165. Defendant filed a pretrial motion to suppress the out-of-court identification and any future in-court identification of defendant by the victim, arguing that the identification should be excluded based on a flawed lineup procedure, including Brown's "feedback" and "coaching." Following a hearing, the trial court denied defendant's motion. In a letter opinion applying the then-controlling case of *State v. Classen*, 285 Or 221, 590 P2d 1198 (1979), the court concluded that Brown followed police guidelines in administering the lineup and that the court could find "no other legal reason why the photographic lineup in this case was unduly suggestive."

In its findings, the trial court noted that the victim was

"seriously injured, although not to the extent of the surviving victim in [*State v.*] *Lawson*[, 239 Or App 363, 244 P3d 860 (2010)]. In any event, [the victim] after five days had recovered enough to specifically note four factors about his assailant, which significantly narrowed the universe of suspects to the defendant, to wit:

"1.  His assailant was a member of the Vagos. This was corroborated by other witnesses.

"2.  His assailant was present at the Red Rock Lounge on the night of the crime wearing Vagos regalia. This was corroborated by other witnesses.

"3.  His assailant was tall and solidly built. This was corroborated by other witnesses, and the Court's observation of the defendant at this motion hearing.

"4. His assailant was a car salesman. This has been corroborated by other witnesses.

"Therefore, this Court believes, with or without the photographic lineup, the defendant in this case would have been the prime suspect[.]"

(Underscoring omitted.) The court continued:

"[The victim] may not have had a perfect view of his assailant at the precise time of the assault, since he has testified that he was 'sucker punched'; but he was definite that the person who 'sucker punched' him is the same person he encountered immediately prior to the assault, and as described above, who wished him a 'good fucking night.'

"* * * * *

"The description given to Detective Brown was five days after the assault, and included all of the details set forth above.

"* * * * *

"Using DMV photographs that were years old, the defendant was 80 [percent] certain; but questioned the age of the photographs. In response, Detective Brown provided the [victim] with surveillance photographs of the suspects which were two days old, which [the victim] was able to identify with almost 100 [percent] certainty."

The trial court concluded that "the accuracy of the identification in this case is a matter for the trial jury," because, "short of 'a very substantial likelihood of irreparable misidentification,' identification evidence is for the jury to weigh."

In addition to challenging the eyewitness identification, defendant filed motions *in limine* to exclude two categories of evidence, both consisting of Vagos-related images and paraphernalia. The first category of evidence was various kinds of Vagos gang imagery that the state had obtained from the internet. This included (1) an image of a gun barrel bearing the slogan "SNITCHES are a DYING BREED" in green lettering; (2) an image, attributed to "Vagos Scandinavia," of an x-ray of a green skull containing the mottos "We Give What We Get" and "Trust No One" and a quote that read, "Whenever your brother bleeds you

bleed, whenever your brother hungers you hunger, wherever your brother lay, you'll shelter him, whenever someone hurts your brother you will avenge him because he would do the same"; (3) an image from a social media page of bloody brass knuckles with overlain text reading, "SNITCHES get STITCHES!"; (4) an image of green flags with iron crosses, a swastika, an encircled "MF" (which stands for "mother fucker," according to evidence introduced during the trial) and the words "SUPPORT GREEN NATION"; (5) an image of iron crosses on a green background with script reading "Brotherhood" and "MY HONOR IS LOYALTY"; (6) an image of three skulls on a green background; (7) an image from a television show's coverage of the Vagos gang titled, "Vagos: Snitch Slaughter"; (8) text on a green background reading, "YOU DON'T LIKE OUR LIFESTYLE WE DON'T LIKE YOUR LAWS"; (9) an image of a diamond-shaped patch with a devil and text reading "1%"; and (10) an image of a devil within a green circle with green text reading "Motherfucker Gang 666."

The second category of evidence included a set of photographs taken of Rives's home, primarily depicting a collection of clothing with Vagos mottos and Vagos patches, as well as a room with green walls featuring a billiards ball symbol (the six ball, a reference to Rives's gang name, "Six Ball").

At a pretrial hearing, defendant argued that all of the Vagos evidence was irrelevant, inadmissible character evidence, and unfairly prejudicial under OEC 403. Defendant first challenged the evidence obtained from the internet:

"[T]his gang evidence is not relevant and sensitive to the jury, and character evidence[.] * * *

"* * * * *

"[A]nybody can make these, a law enforcement member, myself. I can get on and draw some cool Vagos stuff, load it up on the Internet, and then it can be used in a criminal trial against somebody who's never seen them, never made them, doesn't necessarily believe in that."

Defendant further argued that, "[i]t would be different if there had been paraphernalia of this sort found at

[defendant's] house, in his car, in his back pocket, something like that. But there wasn't. There's no connection."

Defendant also challenged the state's assertion that the beliefs espoused in the Internet evidence could be attributed to him.

"[The state is] trying to say that [defendant] as an individual should be attributed all of the beliefs that all the, everything of a Vagos, all the bad things of a Vagos. * * *

"* * * * *

"You have to be able to tie it to [defendant]. You have to show that [defendant] has adopted this belief, or that [defendant] has taken this action.

"You can't say that [defendant] hates snitches and will do anything to stop snitches because there are some Vagos who do. * * *"

The state argued that the evidence was critical to establishing the state's theory of the case because it showed defendant's motive:

"There's a huge gap as to explain why this would ever occur. That's why all the Vago[s] evidence is important, to understand their belief system. * * * This is the Vago[s] creed, you do not snitch.

"* * * * *

"[T]he reason [defendant] got involved is, one, he's got his brother's back. * * *

"They are Vagos, this is what they do, they reinforce their creed. This [has] nothing to do with bad character evidence. It has everything to do with why they did this.

"* * * * *

"This is a Vago[s] defendant and he has identified himself [as] a Vago[s]. He's a patched member.

"They have a motto. They have a creed that they live by. We're entitled to introduce that.

"And his actions, if the jury chooses to believe that, shows he believes in that motto and creed. * * *

"* * * * *

"[T]his evidence explains that his belief system is the Vagos, and the brotherhood, and the snitch, and the loyalty."

The court denied defendant's motion, explaining:

"[T]his assault, in my mind, was just inexplicable. It was just a mystery. And the only way the mystery could be explained was the Vagos affiliation.

"* * * * *

"[The] evidence [shows] that the [d]efendant had a membership in the Vagos, evidence that there is a motive for the assault based on that membership, evidence that it's a tight-knit organization, including their creed motto regarding brotherhood and loyalty to the organization, evidence of their anti-snitch or anti-rat philosophy."

With respect to the other category of challenged evidence, the photos taken of Rives's home, defendant argued:

"First of all, the relevance. There is not a single thing there that is [defendant's], nor is there any connection between [defendant] and [Rives], other than being members of a group.

"* * * * *

"[T]he only purpose to bringing anything of [Rives's] home would be to prejudice the jury, to show that [Rives] is this Vagos nut, for lack of a better word, and totally into this green everything.

"It doesn't do anything to connect [defendant] with it. * * * The only reason to use it would be for cumulative evidence and prejudice.

"Also, this is inadmissible character evidence as well. It does not apply to [defendant]. It does not have a purpose beyond prejudice, unless it is to show that he was in conformity with it, which of course, is inadmissible and should not be allowed."

The state rejoined that the evidence was necessary for a number of reasons:

"[I]t helps corroborate the victim's ID, and particular patches he did testify to and told Detective Brown during the interview, these particular patches, is to establish why [Rives], who is the motivator behind the assault, was so affronted.

"\* \* \* \* \*

"[T]he purpose in doing that is to show this is how in depth, because [Rives has] been a Vago[s] for a very long period of time, [d]efendant has not been a Vago[s] nearly as long— and the purpose is to show that he is backing his brother's back. \* \* \*"

The trial court then sought clarification of its understanding of the state's theory of the evidence from Rives's home:

"THE COURT:   [Y]ou're saying not only is [Rives] a Vago[s], but he's an intense Vagos[.]

"[PROSECUTOR]:   He, this—well yes[.]

"THE COURT:   And because he's an intense Vago[s], he would be especially mad about this snitching. And—

"[PROSECUTOR]:   Correct.

"THE COURT:   —your theory is that [defendant] would—

"[PROSECUTOR]:   Is backing his brother."

In denying defendant's motion, the court explained:

"I can tell we have two distinct theories of the case here. The [s]tate's theory of the case is that [defendant] aided and abetted [Rives]. And the [d]efendant's theory of the case is that there is absolutely no connection between the conduct of [Rives] and the conduct of [defendant]. \* \* \*

"\* \* \* \* \*

"[T]he [s]tate is entitled to present evidence that the Vagos are not like your typical Kiwanis club, in that it's kind of a lifestyle, it's a very dedicated group to each other, they have certain credo. So the intensity of [Rives], the [s]tate is entitled to argue was adopted by [defendant], and that's why he aided and abetted.

"[S]ome of the pictures \* \* \* show the intensity of [Rives's] affiliation with the Vagos, which is relevant. Not unduly prejudicial.

"[H]ow do we know that this Vagos club believes in all these things that, you know, the general Vagos club believe in, about one for all and all for one, and so on. And some of those patches and some of those T-shirts, and some of

those scarves kind of give the [s]tate that evidence that they need, because they have the sayings that the [s]tate wants to rely on about how they distrust authority, they stick together, they're a tight-knit group.

"* * * * *

"[The evidence at issue] is character evidence, but it's relevant character evidence. * * *

"* * * * *

"So the motion to exclude the evidence that was, that has been shown to me and recited on the record, is denied."

At trial, the victim identified defendant in court as the person who had punched and kicked him, as the person who told him to "have a good fucking night" as he left the bar, and as the person who was teased by other Vagos members for being a used car salesman. The victim testified that he was "100 percent" sure that defendant was one of his assailants.

Brown described his interview with the victim and the subsequent administration of the photo lineup at the police station. He testified that "[e]verybody that [the victim] identified as being present [during the assault] * * * confirmed what he had told us" and explained that, based on the victim's initial description of his assailants, Brown "did not know who they were" and actually had a different suspect in mind when he showed the photos to the victim. After the victim identified defendant and Rives, however, Brown said that the descriptions "fit."

Defendant called Dr. Reisberg, an eyewitness identification expert, to testify regarding the procedure that was used:

"I mean, clearly [the victim] was telling the police officer he did not see the guy. He mentioned that the episode was very brief. He mentioned how dark it was. He talked about being blind-sided[.] * * *

"* * * * *

"[T]his was going to be a case in which the memory was just, you know, as thin as could be, and therefore, going to be fairly easy to shove around if there was any sort of suggestion or slipup in the police investigation.

"\* \* \* \* \*

"I wish I could find a polite word for it, I found that procedure to be bizarre, because the procedure, first of all failed on the rule of one suspect per lineup, because there was no lineup. I mean basically, everybody was a suspect, so we failed on that step.

"\* \* \* \* \*

"The police officer, in a wonderfully friendly way, was chatting right along with the victim as the ID was going, and so he failed on the rule that says you keep out of it. And he was providing immediate feedback on, I think, every single choice.

"\* \* \* \* \*

"I've already said feedback changes confidence. \* \* \*

"But in addition, the police officer had correctly given the standard warning before the lineup. I mean that part was done the right way. That's one of the things that went well here.

"But the police officer, I mean, having said, 'The guy may or may not be there' was immediately communicating to the witness, 'yes, I know these guys. Some of these guys are in jail.' \* \* \* He makes it clear he's familiar with all these guys. He makes it clear that these guys have all been under surveillance.

"And so, unless the victim was an idiot, \* \* \* he instantly knew that these were all Vagos \* \* \* he instantly knew that these were all suspects. \* \* \*

"And what that does, is basically blow away the crucial message that is contained in that admonishment. \* \* \*

"This was a dreadful ID procedure."

On cross-examination, the state questioned Reisberg's assertion that the procedure Brown used was inherently suggestive:

"[PROSECUTOR]: [A]re you aware that the risk of false identification is increased by the use of a simultaneous six-pack, as opposed to a sequential presentation format? Sequential presentation format is actually more accurate?

"\* \* \* \* \*

"[REISBERG]:  All other things equal, all other things properly matched, a sequential lineup is preferable."

Reisberg clarified that "a terribly constructed sequential lineup would not be better than any simultaneous lineup." On further cross-examination, Reisberg also addressed whether the procedure would have steered the victim to identify any particular person:

"[REISBERG]:  [I]f [the victim] has been consistent, that is highly useful for the police and would allow them to narrow their field of suspects to focus on the Vagos. That would be a sensible thing for the police to do.

"* * * * *

"That's fine as long as [police] don't draw attention to one of the options. That's part of good questioning.

"* * * * *

"[PROSECUTOR]:  [B]ased on your review of the reports, listening to the interview, it was clear to you that Detective Brown was not only trying to find suspects, he was also trying to identify witnesses that could have been present at the scene or at the bar that night?

"* * * * *

"[REISBERG]:  Yes, he was clearly trying to find out who was present that evening, and above and beyond who the attackers might have been.

"[PROSECUTOR]:  [C]an you please provide a specific example where [Detective] Brown coached [the victim] in identifying that individual for the recording?

"[REISBERG]:  I don't think I said he did coach him toward specific individuals. I mean he certainly gave a considerable amount of feedback that would suggest that, I mean, yes, these were the guys who were suspects, these were the guys who were likely to be there. * * *

"* * * * *

"He certainly encouraged identifications. I don't think you could say he encouraged identification of specific individuals."

After closing arguments, the trial court provided the jury with the following instructions:

"In this case, to establish the crime of assault in the third degree the [s]tate must prove beyond a reasonable doubt the following four elements:

"(1)   The act occurred in Josephine County, Oregon;

"(2)   The act occurred on or about September 30, 2010;

"(3)   [Defendant] knowingly caused physical injury to [the victim]; and

"(4)   [Defendant] was aided by another person actually present.

"* * * * *

"If you find that the Defendant was associated with the Vagos you may consider this evidence only for its bearing, if any, on the motive or reasons why the alleged criminal conduct occurred in this case. Specifically, you may not use this evidence for the purpose of drawing the inference that because the Defendant was associated with the Vagos the Defendant may be guilty of the crime charged in this case."

The jury convicted defendant of assault in the third degree.

## II.   DISCUSSION

On appeal, defendant first assigns error to the trial court's denial of his motion regarding the victim's eyewitness identifications. He argues that there are "sufficient questions" regarding the reliability of the identifications so as to require reversal for a new hearing and a new trial. Defendant also assigns error to the denial of his motions to exclude the Vagos gang evidence, arguing that that evidence is irrelevant, is inadmissible character evidence, and, even if relevant, should have been excluded as unduly prejudicial. For the reasons that follow, we reject all of defendant's arguments.

### A.   *Eyewitness Identification Evidence*

The trial court's rulings occurred prior to the Supreme Court's decision in *State v. Lawson/James*, 352 Or 724, 291 P3d 673 (2012), which substantially revised the framework

for determining the admissibility of eyewitness identification evidence. Defendant argues that *Lawson/James* calls the evidence in this case into such question that we should remand to the trial court for a new hearing and trial.

In *Lawson/James*, the Supreme Court concluded that the then-controlling *Classen* test was an inadequate means of achieving the "goal of ensuring that only sufficiently reliable identifications are admitted into evidence." *Lawson/James*, 352 Or at 746. The court took judicial notice of two sets of factors that, based on decades of scientific research, have been found to affect the reliability of eyewitness identifications: "estimator variables" and "system variables." *Id.* at 740. Estimator variables "generally refer to characteristics of the witness, the alleged perpetrator, and the environmental conditions of the event that cannot be manipulated or adjusted by state actors." *Id.* Estimator variables include (1) the witness's level of stress; (2) the witness's focus and attention; (3) the duration of exposure to an alleged perpetrator; (4) environmental viewing conditions; (5) the witness's physical and mental characteristics and condition; (6) the witness's description of the perpetrator; (7) the perpetrator's characteristics; (8) the speed of the identification; (9) the witness's confidence or certainty (noted as not reliably indicative of accuracy); and (10) memory decay. *Id.* at 744-46.

System variables refer to "the circumstances surrounding the identification procedure itself that are generally within the control of those administering the procedure." *Id.* at 740. System variables include factors such as (1) whether the identification procedure was conducted by a person who was unaware of the suspect's identity; (2) whether preidentification instructions were given to reduce the likelihood of misidentification; (3) the manner in which the photographic lineup was constructed and presented to the witness; (4) whether multiple viewings of the suspect could have led to source confusion; (5) whether suggestive wording or leading questions by investigators could have contaminated the witness's memory; and (6) whether confirming feedback could have falsely inflated the witness's confidence in the accuracy of his or her identification. *Id.* at 741-44.

In *Lawson*,[3] the court determined that estimator variables had undermined the reliability of an eyewitness identification, where the witness had suffered a gunshot wound to the chest, was "under tremendous stress and in poor physical and mental condition," and was "unsure whether her husband was alive or dead" when she observed the perpetrator "for only a few seconds at most, and only in profile." *Lawson/James*, 352 Or at 763. The encounter was dark, the witness was lying on the floor of a camping trailer, and the perpetrator covered the witness's face with a pillow "for the specific purpose of obscuring [the witness's] view of him." *Id.*

Moreover, the witness's in-court and out-of-court identifications were made more than two years after her "brief view" of him. *Id.* at 764. The court noted that "[m]emory decays over time, and the effects of that memory loss are exacerbated when the initial encoding of the memory is impaired by other variables." *Id.*

The court also concluded that system variables, including overly suggestive police practices, had undermined the reliability of the witness's identification. Police asked the witness "leading questions that implicitly communicated their belief that defendant was the shooter" while the witness was "heavily medicated" and "could not speak or move her hands." *Id.* The court reasoned that, because the witness "could respond only by nodding or shaking her head," and given her greatly impaired physical and mental conditions, she "would have been especially susceptible to memory contamination from suggestive questioning." *Id.*[4]

---

[3] *Lawson/James* consolidated two criminal cases that raised similar eyewitness-identification issues (*i.e.*, *Lawson* and *James*). 352 Or at 727.

[4] Conversely, in *James*, which involved the robbery of a grocery store, eyewitnesses observed two men in the store and were face-to-face with the men as the men fled. *Lawson/James*, 352 Or at 732-33. Minutes later, the witnesses were able to describe to police the race, height, weight, and clothing of the two suspects. *Id.* at 765. The Supreme Court concluded that the eyewitnesses had "clear opportunities to observe [the] features" of the perpetrators, and that, "[a]lthough some estimator variables could have negatively affected the witnesses' perceptions, others indicate that the witnesses' observations were reliable." *Id.* at 766. Under those circumstances, "no reasonable decision maker could find that the witnesses did not have the personal knowledge necessary to identify the perpetrators." *Id.*

*Lawson/James* set forth a new framework for addressing challenges to eyewitness identification reliability. Under *Lawson/James*, "when a criminal defendant files a pretrial motion to exclude eyewitness identification evidence, the state—as the proponent of the eyewitness identification—must establish all preliminary facts necessary to establish admissibility." 352 Or at 761. Three interrelated evidentiary concepts are implicated in this initial step: (1) relevance under OEC 401; (2) personal knowledge under OEC 602; and (3) lay opinion evidence under OEC 701. *Lawson/James*, 352 Or at 752-56. If the state satisfies those threshold requirements for admissibility, the burden shifts to the defendant to prove that, under OEC 403, the evidence should nonetheless be excluded. *Id.* at 756-58.

First, as to relevance under OEC 401, the Supreme Court observed that "[e]yewitness identification evidence will nearly always meet that basic standard for relevance." *Lawson/James*, 352 Or at 752.

`Next, an identification satisfies the personal knowledge requirement under OEC 602 if the state demonstrates "both that the witness had an adequate opportunity to observe or otherwise personally perceive the facts to which the witness will testify and did, in fact, observe or perceive them, thereby gaining personal knowledge of the facts." *Lawson/James*, 352 Or at 753. In other words, estimator variables are relevant to that inquiry. OEC 602 "expressly permits evidence of personal knowledge to consist of the witness's own testimony." *Lawson/James*, 352 Or at 753. Because "a witness is presumed to speak the truth," jurors are "the exclusive judges of the credibility of a witness." *Id.* at 752 n 8 (internal quotation marks and citations omitted).

The third threshold requirement, under OEC 701, is "that any identification is both rationally based on the witness's first-hand perceptions and helpful to the trier of fact." *Lawson/James*, 352 Or at 762. That is where system variables come into play. The Supreme Court explained that, when a witness's perceptions support an inference of identification, but are "nevertheless met with competing evidence of an impermissible basis for that inference" (such as suggestive police procedures), "an issue of fact arises as to

whether the witness's subsequent identification was derived from a permissible or impermissible basis." *Id.* at 755. If the facts indicate that a witness "could have relied on something other than his or her own perceptions," then the state must establish, by a preponderance of the evidence, that the witness's identification was grounded in a permissible basis. *Id.* Put another way, the trial court must ascertain whether it was more likely than not that the witness's identification was based on his own perceptions. *Id.* at 755-56.

If the state establishes the requisite foundation for the admission of eyewitness identification evidence, the burden shifts to the defendant to prove "under OEC 403 that, although the eyewitness evidence is otherwise admissible, the probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." *Id.* at 762. As cautioned in *Lawson/James*,

> "[i]f the state's administration of one or more of the system variables (either alone or combined with estimator variables) results in suggestive police procedures, that fact can, in turn, give rise to an inference of unreliability that is sufficient to undermine the perceived accuracy and truthfulness of an eyewitness identification—*only then* may a trial court exclude the eyewitness identification under OEC 403."

352 Or at 763 (emphasis added).[5]

The framework set forth in *Lawson/James* applies to both in-court and out-of-court identifications.[6] Although

---

[5] A trial court must consider system and estimator variables in determining whether the probative value of the challenged evidence is undermined by the presence of those factors. *Lawson/James*, 352 Or at 752-58. This is particularly true when determining whether, under OEC 403, an identification's probative value is outweighed by its undue prejudice. *Id.* at 757 ("The more factors—the presence of system variables alone or in combination with estimator variables—that weigh against reliability of the identification, the less persuasive the identification evidence will be to prove the fact of identification, and correspondingly, the less probative value the identification will have.").

[6] In a subsequent case, the Supreme Court examined the unique challenges presented by in-court identifications. *State v. Hickman*, 355 Or 715, 330 P3d 551 (2014). *Hickman* primarily addressed how *Lawson/James* applies when a defendant is identified for the first and only time in open court—that is, when

*Lawson/James* substantially revised the standard for the admission of eyewitness evidence, the court also observed:

> "[T]rial courts will continue to admit *most* eyewitness identifications * * * because * * * it is doubtful that issues concerning one or more of the estimator variables that we have identified will, without more, be enough to support an inference of unreliability sufficient to justify the exclusion of the eyewitness identification. * * * [D]efendants will likely prefer to probe the issues regarding estimator variables through cross-examination, * * * expert testimony and case-specific jury instructions."

*Id.* at 762-63 (emphasis added).

In reviewing a trial court's admission of eyewitness identification evidence, we defer to the court's findings of fact so long as they are supported by any evidence in the record; we review the trial court's evidentiary ruling for legal error. *State v. Collins*, 256 Or App 332, 334, 334 n 3, 300 P3d 238 (2013) (applying *Lawson/James*). If a defendant moves to exclude identification evidence on the ground that it is unfairly prejudicial, and the trial court rules otherwise, we review that ruling for abuse of discretion. *Lawson/James*, 352 Or at 762.

---

suggestive pretrial procedure is not an issue. But the court also discussed system variables in the context of in-court identifications:

> "[T]he risk of misidentification stemming from an in-court identification is elevated by the inherently suggestive circumstances of a procedure that * * * can be analogized to a suspect show-up. * * * [O]nce an in-court identification occurs, it may be too late to construct and administer a nonprejudicial identification procedure. The dilemma is how to mitigate the risk of error in factfinding and still honor our fundamental belief that the trusted rule of law depends on broad citizen participation in the adjudicative process."

*Hickman*, 355 Or at 741.

*Hickman* further warned that, in cases involving a pretrial, out-of-court identification, a risk exists that a later in-court identification may be based not on the witness's "recollection of observations at the time of the crime charged" but rather as a result of a "suggestive pretrial identification." *Id.* at 734. Likewise, because the trier of fact was not present for the initial out-of-court identification, he or she is unable to observe and evaluate the witness's *initial* identification, meaning that variables such as "witness certainty or hesitation," "facial expression, voice inflection, and body language, and any other observations pertinent to assessing the reliability of a person's statements, are unavailable to the factfinder for evaluative purposes." *Id.* at 735. As such, where an in-court identification confirms an earlier identification, "there is a risk that the later identification will be expressed with greater certainty than the earlier identification." *Id.*

We return to the facts of this case. Defendant argues that, under *Lawson/James*, the trial court erred in admitting the in-court and out-of-court eyewitness identifications by the victim. Defendant cites both system variables (*i.e.*, Brown's "suggestive feedback" and "improper" identification procedures) and estimator variables (*i.e.*, the victim's "high level of stress;" his inattention to his attacker during a brief, dark encounter; and his initial inability to remember details about the attack) to argue that the identifications were so unreliable as to require remand for a new hearing and a new trial. The state responds that, although the trial court did not have the benefit of the new *Lawson/James* framework, we need not remand because the record amply demonstrates that the victim's identification was sufficiently reliable to be admitted under *Lawson/James*. We agree with the state.

As for the first prong under *Lawson/James*, we easily conclude that the victim's eyewitness identification satisfies the low threshold of relevance under OEC 401. Defendant does not argue otherwise.

Next, the eyewitness identification meets the personal knowledge requirement under OEC 602. Defendant's challenges to the victim's perceptions are unpersuasive. Before being shown any photos, the victim was able to describe the assault and his assailants in detail, including defendant's height, approximate age, and physical stature. The victim also was able to describe both assailants as being among several Vagos members present at the bar that night, and defendant as being teased for being a used car salesman. As the trial court found, although the victim "may not have had a perfect view of his assailant," the victim was "definite" that the person who "'sucker punched'" him was the "same person he encountered immediately prior to the assault * * * who wished him a 'good fucking night.'" The victim also recalled that defendant was walking to the side of him in the parking lot, touched him on the shoulder and said, "Well, walk to your car," just prior to the punch. All of that is more than enough to demonstrate, for purposes of OEC 602, that the victim's identification was based on his personal knowledge.

As the third and final threshold requirement for admissibility, *Lawson/James* directs us to consider the

identification procedure under OEC 701. If there is evidence that a witness *may* have relied on an impermissible basis (such as suggestive police procedures), then "an issue of fact arises as to whether the witness's subsequent identification was derived from a permissible or impermissible basis." 352 Or at 755. When facts indicate that a witness "could have relied on something other than his or her own perceptions," the state must establish, by a preponderance of the evidence, that the witness's identification was more likely than not the product of his own perceptions. *Id.*

Thus, the "issue of fact" as to the basis for the witness's identification arises only if there is some evidence that the witness *could* have based his identification on something other than his own perceptions. Here, defendant cites various defects in the procedure that Brown used, including the fact that the lineup procedure was not blindly administered; that the composition of the photos was improper; and that Brown provided "constant feedback" to the victim during the lineup. Viewed in total, we doubt that those alleged problems are sufficient even to raise an issue of fact as to the basis for the victim's identification. Even assuming, for the sake of argument, that defendant has sufficiently raised an issue of fact, that issue (applying a preponderance-of-the-evidence standard under *Lawson/James*) can be reasonably resolved only in the state's favor.

Defendant's arguments misapprehend exactly what Brown did and why. It is correct that *Lawson/James* warned that, "[i]deally, all identification procedures should be conducted by a 'blind' administrator—a person who does not know the identity of the suspect," but that is aimed at preventing investigating officers from "consciously or unconsciously" signaling to the witness that they suspect a particular person of the crime. 352 Or at 741-42. Here, the record establishes not only that Brown did *not* suspect defendant of the assault at the time of the interview, but that Brown actually suspected someone else. The record further establishes that Brown's objective was to gather information about possible witnesses by having the victim identify members of the Vagos gang who were present in the bar. Brown's instructions also communicated to the victim that his assailant

might not be included in the group, which "significantly decreased" any "likelihood of misidentification." *Id.* at 742.[7]

Defendant next argues that the construction of the photo lineup was improper because the subjects were not all chosen on the basis of physical similarity to the victim's description of his assailant. As *Lawson/James* explains:

> "An identification procedure is essentially an informal and unscientific experiment conducted by law enforcement officials to test their hypothesis that a particular suspect is, in fact, the perpetrator that they seek. The known-innocent subjects used as lineup fillers should be selected first on the basis of their physical similarity with the witness's description of the perpetrator; if no description of a particular feature is available, then the lineup fillers should be chosen based on their similarity to the suspect."

*Id.* at 742.

But this, as the state points out, was not a typical lineup procedure. The victim's account gave Brown a very specific basis for identifying both assailants and witnesses—their membership in the Vagos gang. Although the procedure here differed from a standard lineup, it was logical (and, as defendant's own expert acknowledged, "sensible" under the circumstances). Nor is there any indication in the record that the lineup's administration steered the victim toward identifying defendant as his assailant.

The record also indicates that the victim knew that the purpose of the procedure was for him to potentially identify his attackers *and* identify other possible witnesses to the assault. That he was able to identify defendant, Rives, and other individuals present—and the fact that the victim's account was also corroborated by other witnesses—strongly supports the conclusion that the victim's identification of defendant was based on the victim's own perceptions rather than on any deficiency in the identification procedure.[8]

---

[7] At trial, Reisberg testified that Brown's instruction was nullified by his subsequent "considerable amount of feedback." But Reisberg also testified that Brown's comments did not encourage the identification of any specific person.

[8] We also note that the photos were administered in a sequential order, rather than simultaneously. "In a lineup procedure in which the witness is presented with each individual person or photograph sequentially, the witness is less

Defendant also argues that, by showing the victim more recent photos of defendant and Rives, Brown created a risk of "mugshot exposure," a concern addressed in *Lawson/James*:

> "Viewing a suspect multiple times throughout the course of an investigation can adversely affect the reliability of any identification that follows those viewings. The negative effect of multiple viewings may result from the witness's inability to discern the source of his or her recognition of the suspect, an occurrence referred to as source confusion or a source monitoring error."

*Id.* at 743.

Here, the victim asked Brown, after having already identified defendant as one of his assailants, how old the photos used in the lineup were. Brown replied that they were a "couple years" old and that he could provide more recent photos, which he eventually did. *Before* seeing any newer photos, however, the victim returned to the photo of defendant that was included in the lineup and told Brown that defendant was "absolutely" the man who said "have a good fucking night" and then punched him. The fact that the victim, without prompting, asked about the age of the photos themselves indicates that the victim recalled his contemporaneous observations with clarity. This was not a situation, in other words, where a suspect's photo was shown to the witness multiple times in different lineups, creating the risk that "the suspect may tend to stand out or appear familiar to the witness as a result of a prior lineup, especially when the suspect is the only person who appeared in both lineups." *Id.* at 785.

Lastly, the defendant argues that Brown provided "constant feedback" during the lineup administration. That is also a concern that *Lawson/James* addressed:

> "Post-identification confirming feedback tends to falsely inflate witnesses' confidence in the accuracy of their identifications, as well as their recollections concerning the quality of their opportunity to view a perpetrator and an event. Confirming feedback, by definition, takes place after

able to engage in relative judgment, and thus is less likely to misidentify innocent suspects." *Lawson/James*, 352 Or at 742.

an identification and thus does not affect the result of the identification itself."

*Id.*

The record does indicate that Brown provided feed-back to the victim during the identification procedure. *Lawson/James* warns that doing so creates a risk of inflating the witness's confidence in his recollections. Nevertheless, we do not believe that the record in this case permits a con-clusion that Brown's limited "feedback" unduly influenced the victim. Unlike *Lawson/James*, where, "[a]fter a series of leading questions inculpating defendant, [the *Lawson* vic-tim] agreed with police that [the] defendant was the perpe-trator, but still could not identify him," 352 Or at 765, the victim's identifications of defendant in this case were consis-tent, unequivocal, and made without any leading questions. Furthermore, Brown's comments could not have confirmed to the victim that defendant was a suspect because, as noted, Brown did not initially suspect that defendant was one of the assailants. For those reasons, any reasonable factfinder would conclude that the victim's identifications of defendant were "more likely based" on his "own perceptions" than on any other factors. *Id.* at 755-56.

OEC 701 also requires the state to show that the identification evidence would be helpful to the trier of fact, a burden that *Lawson/James* noted "will be easily satisfied in nearly all cases * * *." *Id.* at 756. We easily conclude that evidence of the victim's identification of defendant as one of his assailants would be helpful to a trier of fact in an assault case.

Because, for the foregoing reasons, we conclude that the victim's identifications of defendant meet the threshold requirements for admissibility under *Lawson/James*, defen-dant can prevail only by showing that the evidence is inad-missible under OEC 403 because its probative value is out-weighed by its danger of unfair prejudice. *Lawson/James*, 352 Or at 757. Defendant makes no OEC 403 argument on appeal. Accordingly, because OEC 403 provides no basis in this case for the exclusion of admissible evidence, we con-clude that the trial court correctly denied defendant's motion to suppress.

## B. *Vagos Gang Evidence*

Defendant next contends that the trial court erred in denying his motions *in limine* to exclude the two sets of Vagos-related evidence: the Vagos images downloaded from the internet (the "internet evidence") and the photos of Rives's house, apparel, and Vagos logos and slogans (hereinafter the "Rives evidence"). On appeal, defendant and the state combine their evidentiary arguments as to both sets of evidence and refer to them jointly as the "Vagos paraphernalia" evidence. As explained below, we review those sets of evidence separately and reach different conclusions. First, we conclude that the internet evidence was relevant "other act" evidence under OEC 404(3) and OEC 404(4) for the purpose of establishing defendant's motive for the assault, and that the trial court did not abuse its discretion under OEC 403 in admitting that evidence. Second, we conclude that the Rives evidence was irrelevant and, therefore, inadmissible, but that its erroneous admission was harmless.

Turning first to the internet evidence, we must address whether that evidence is relevant. We review a trial court's determination of relevance for errors of law. *State v. Davis*, 336 Or 19, 25, 77 P3d 1111 (2003). Relevant evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. The Oregon Supreme Court has phrased the inquiry as to whether evidence is relevant as follows: "Does the item of evidence *even slightly* increase or decrease the probability of the existence of any material fact in issue? If the item of evidence affects the balance of probabilities to any degree, it is logically relevant." *State v. Gailey*, 301 Or 563, 567, 725 P2d 328 (1986) (emphasis added).

In this case, defendant argues that the internet evidence is irrelevant because the state "failed to establish a connection between the proffered evidence and the defendant" and because the evidence "is irrelevant to show defendant's motive." The state rejoins that the evidence is relevant to show defendant's motive for the assault—*viz.*, that "Vagos hate snitches and are loyal to one another, both Rives and defendant were Vagos members, Rives had a problem with

the victim because the victim was friends with a snitch, and defendant initiated the assault on the victim out of loyalty to Rives." Thus, the state "wanted the jury to infer from the fact that defendant had joined a group holding particular beliefs that he held those beliefs himself." The state further argues that the defendant's "undisputed" membership in the Vagos gang was sufficient to allow the state to introduce evidence from "various sources about the tenets of that group that were probative of the motive for the charged assault."

A defendant's membership in a gang may warrant, under certain circumstances, admitting evidence of that gang's belief system. The United States Supreme Court has held that, if a person belongs to a defined group, evidence of that group's beliefs or tenets may be admissible to show that the person acted in accordance with those beliefs or tenets, "even without proof" that the person has specifically or expressly adopted them. *See United States v. Abel*, 469 US 45, 52-53, 105 S Ct 465, 83 L Ed 2d 450 (1984) (explaining that, "[f]or the purposes of the law of evidence the jury may be permitted to draw an inference of subscription to the tenets of the organization from membership alone, even though such an inference would not be sufficient to convict" a person of being a member of an organization that engages in illegal conduct);[9] *see also State v. Hayward*, 327 Or 397, 407, 963 P2d 667 (1998) (holding that, where the state's theory was that the defendant intended to "commit murder, not merely robbery," evidence of the defendant's interests in Satanism and death metal music was relevant to "explain the brutality of the attacks").

We have held, however, that evidence of a defendant's gang activity, including involvement in drive-by shootings, gang attire, and related behavior, is not relevant if that evidence fails to "reasonably and fairly relate[] to a fact or issue about the charged crime." *State v. Stone*, 104 Or App

---

[9] *Abel* is persuasive authority for this court in applying the Oregon rules of evidence. *See, e.g., State v. O'Key*, 321 Or 285, 292 n 7, 899 P2d 663 (1995) ("When we cite a decision of the Supreme Court of the United States in interpreting a provision of the Oregon Evidence Code, we do so because we find the views there expressed persuasive, not because we consider this court bound to do so by our understanding of federal doctrines. * * * [T]he Oregon Evidence Code is modeled on the Federal Rules of Evidence.").

534, 540, 802 P2d 668 (1990). In *Stone*, a defendant sought to suppress evidence of his gang affiliation on the ground that it was irrelevant to prove that he knew that the vehicle he was driving was stolen. *Id.* at 538. The state argued that, because gang members often drive stolen cars to commit drive-by shootings, defendant's gang membership made it more likely that defendant knew that the car was stolen, and the trial court agreed. *Id.* at 538-39. We reversed, reasoning that "[d]efendant was not on trial for committing or attempting to commit a drive-by shooting or for gang activities of any sort." *Id.* at 540.

In light of those authorities, we agree with the state that the internet evidence is relevant because it is probative of defendant's motive. Evidence of motive tends to be relevant because it "makes more probable the fact that defendant committed the crime than if such a motive were not established." *State v. Hampton*, 317 Or 251, 258, 855 P2d 621 (1993).

Here, the internet evidence is illustrative of the Vagos belief system, including the importance of being loyal to gang "brothers" and taking violent action against "snitches." The evidence thus tends to explain why defendant, a self-described Vagos member, would have felt justified in assaulting the victim, who was a friend of a "snitch." It bears emphasis that defendant does not dispute his own membership in the Vagos gang, nor does defendant contend that the internet evidence is not fairly representative of the Vagos gang as an entity. Rather, defendant argues that the views reflected by that evidence cannot, as a matter of law, be ascribed to him merely because he is a member of the gang. That argument is unavailing. *See Abel*, 469 US at 53 (explaining that, "[f]or purposes of the law of evidence the jury may be permitted to draw an inference of subscription to the tenets of the organization from membership alone").

We next consider whether the internet evidence, though relevant, should have been excluded under other provisions of the Oregon Evidence Code. Defendant argues that the evidence is inadmissible character or "propensity" evidence under OEC 404 because it was offered to prove that defendant acted in conformity with the character trait

of loyalty and was not admissible under exceptions to that bar. The state responds that the evidence was not character evidence at all because it was not introduced to show that defendant "is a loyal person in all the varying situations in life," but instead was offered to prove that he "acted out of loyalty to a *particular person at a particular time.*" (Emphasis in original.) The trial court concluded that the evidence is "character evidence, but it's relevant character evidence" because it illuminates a motive for an assault that was otherwise "inexplicable." We agree with the trial court.

We understand the state's argument to be that "character" refers to a generalized trait that is present in an individual at all times. Thus, in the state's view, evidence that Vagos gang members are loyal to each other, for example, suggests only that defendant is loyal some of the time, not that he displays the general trait of loyalty "all of the time." In our view, the state defines character evidence too narrowly.

Although "character" is not defined in the Oregon Evidence Code, the Supreme Court has explained the concept as follows:

> "'[c]haracter is a generalized description of a person's disposition, or of the disposition in respect to a general trait, such as honesty, temperance or peacefulness.' *** [W]hen we speak of a character for carefulness, we think of the person's tendency to act prudently in all the varying situations of life—in business, at home, in handling automobiles, and in walking across the street.
>
> "Character evidence, therefore, is evidence of a particular human trait, such as truthfulness, honesty, temperance, carefulness, or peacefulness, *etc.*"

*State v. Marshall,* 312 Or 367, 372, 823 P2d 961 (1991) (citing McCormick, 574 *Evidence* § 195 (3d ed 1984) (internal citations omitted)); *State v. Johns,* 301 Or 535, 548, 725 P2d 312 (1986) ("'[C]haracter' refers to disposition or propensity to commit certain crimes, wrongs or acts."). Character evidence is generally not admissible "for the purpose of proving that a person acted in conformity therewith on a particular occasion," OEC 404(2), but it can be admitted to prove "an essential element of a charge, claim or defense," OEC 404(1).

Evidence of other crimes, wrongs, or acts may be admissible for other purposes, however, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." OEC 404(3).

Under the circumstances of this case, we agree with defendant and the trial court that the internet evidence is character evidence. Defendant was an undisputed member of the Vagos gang. The state argued that, because defendant had "joined a group holding particular beliefs," a jury could infer that "defendant held those beliefs himself." According to the state, those tenets included loyalty to the gang and a hatred for "snitches." In offering evidence of the Vagos' tenets, the state urged an inference that, because defendant was a member of the Vagos, defendant had personally adopted those tenets and lived by them. The state wanted the jury to conclude that defendant acted in accordance with those tenets in committing the assault. Because the state offered the internet evidence to convince the jury that defendant's behavior on a specific occasion conformed to a set of beliefs or values that defendant held, that evidence was character evidence of defendant's motive. We next consider whether it was admissible.

As noted above, OEC 404(3) provides that evidence of a defendant's "other acts" may be admissible to prove, among other things, motive. As a threshold matter, we reject defendant's argument that the internet evidence cannot be admissible under that rule because defendant did not personally generate the materials that the state downloaded from the internet. The "other act," under the circumstances of this case, is properly understood as defendant's membership in the Vagos gang. The internet evidence gives context and meaning to that evidence. Thus, the fact that defendant did not personally produce the internet evidence is not a barrier to evaluating its admissibility under OEC 404(3) and OEC 404(4).

Our task is both complicated and simplified by the fact that the applicable law has changed since the time of defendant's trial and since the parties completed their briefing on appeal. At the time of defendant's trial, the admissibility of other-act evidence under OEC 404(3) was governed

by a three-part test, set forth in *Hampton*, 317 Or at 254. The *Hampton* test required that the evidence must be (1) "independently relevant for a noncharacter purpose"; (2) the proponent of the evidence must offer sufficient proof that the "uncharged misconduct [*i.e.*, the prior act] was committed and that defendant committed it"; and (3) the probative value of the uncharged misconduct evidence "must not be substantially outweighed by the dangers or considerations set forth in OEC 403." *Id.* (quoting *State v. Johnson*, 313 Or 189, 195, 832 P2d 443 (1992)).

In *State v. Williams*, 357 Or 1, 24, 346 P3d 455 (2015), however, the Supreme Court held that OEC 404(4) "supersedes" OEC 404(3) in criminal cases "except to the extent required by the state or federal constitution," and "the admission of 'other acts' evidence to prove character and propensity under OEC 404(4) depends on whether the risk of unfair prejudice outweighs the probative value of the evidence under OEC 403," *id.* at 20.[10] In the wake of *Williams*, "other acts" evidence offered "for nonpropensity purposes— *i.e.*, to prove motive * * * generally will be admissible as long as the particular facts of the case do not demonstrate a risk of unfair prejudice that outweighs the probative value of the evidence." 357 Or at 19.

The question before us now is whether, under the new *Williams* framework, the internet evidence is admissible as relevant, "other act" evidence of defendant's motive. To be admissible to prove motive under *Williams* and OEC 404(4), that evidence must be relevant under OEC 401 and not unduly prejudicial under OEC 403.

As already discussed, we agree with the trial court's conclusion that the internet evidence of the Vagos belief system is highly relevant to show defendant's motive

---

[10] OEC 404(4) provides:

"In criminal actions, evidence of other crimes, wrongs or acts by the defendant is admissible if relevant except as otherwise provided by:

"(a) [OEC 406 through 412] and, to the extent required by the United States Constitution or the Oregon Constitution, [OEC 403];

"(b) The rules of evidence relating to privilege and hearsay;

"(c) The Oregon Constitution; and

"(d) The United States Constitution."

for assaulting the friend of a perceived "snitch." The trial court also concluded that the evidence was "not unduly prejudicial" under OEC 403. We review that determination for abuse of discretion. *State v. Shaw*, 338 Or 586, 614-15, 113 P3d 898 (2005). In this case, we readily conclude that the court acted within its discretion in admitting the evidence.

Evidence is unfairly prejudicial when it has "an undue tendency to suggest a decision on an improper basis, commonly, although not always, an emotional one," and when "the preferences of the trier of fact are affected by reasons essentially unrelated to the persuasive power of the evidence to establish a fact of consequence." *State v. Lyons*, 324 Or 256, 280, 924 P2d 802 (1996). OEC 403 "favors admissibility and places the burden on the party seeking exclusion of the evidence, but it also allows a means of excluding distracting evidence from a trial." *State v. Sewell*, 257 Or App 462, 469, 307 P3d 464 (2013). When a trial court is presented with a request to exclude evidence as unfairly prejudicial under OEC 403, the court must (1) "analyze the quantum of probative value of the evidence and consider the weight or strength of the evidence"; (2) "determine how prejudicial the evidence is, to what extent the evidence may distract the jury from the central question whether the defendant committed the charged crime"; (3) "balance the prosecution's need for the evidence against the countervailing prejudicial danger of unfair prejudice"; and (4) "admit all the proponent's evidence or admit only part of the evidence." *Sewell*, 257 Or App at 464-65 (citing *State v. Mayfield*, 302 Or 631, 645, 733 P2d 438 (1987) (internal punctuation marks omitted)). Evidence is "cumulative when it demonstrates the same thing as other admitted evidence." *State v. Bradley*, 253 Or App 277, 285, 290 P3d 827 (2012).

In this case, the trial court could (and did) conclude that the internet evidence was indispensable to the state's theory of motive because the assault was otherwise "inexplicable." Moreover, although defendant argues that the evidence of Vagos' slogans and imagery was inflammatory to the jury and caused jurors to fear him, the trial court could have concluded that any such prejudice was not *unfair* under the circumstances. *See State v. Barone*, 328 Or 68, 88,

969 P2d 1013 (1998) (although autopsy photographs "were graphic, they could not be said to be remarkable in the context of a murder trial"); *Hayward*, 327 Or at 408 (concluding that, in the context of a violent robbery, assault, and murder, evidence of defendant's interest in Satanism as an explanation for his motive was not unduly prejudicial).[11] In short, the trial court was within its discretion to conclude that the internet evidence was not unduly prejudicial and thus was not barred by OEC 403.

We next consider the admissibility of the second set of evidence—the Rives evidence—which consisted of a set of photographs taken of Rives's home, depicting Rives's collection of Vagos clothing and his Vagos-inspired home décor. As noted, relevant evidence has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. Here, even if we agree with the state's theory as to why evidence of the Vagos belief system was generally relevant to explain defendant's motive, we fail to see how photographs of Vagos paraphernalia at *Rives*'s home is probative of *defendant's* motive for assaulting the victim. Put differently, the Rives evidence does not "reasonably and fairly relate[] to a fact or issue about the charged crime," *Stone*, 104 Or App at 540, because it indicates only the strength of Rives's own commitment; it tells us nothing about defendant's commitment. The Rives evidence, as the trial court found, did not include "anything *** that addresses the snitch issue," unlike the internet evidence previously discussed. Accordingly, the Rives evidence does not have any tendency to make the state's theory of motive more or less probable. Thus, it is irrelevant and should have been excluded.

---

[11] Other jurisdictions have highlighted the risks of admitting evidence of a defendant's gang affiliation. *See, e.g., United States v. Irvin*, 87 F3d 860, 866 (7th Cir 1996) (recognizing that evidence "containing devil's heads and demonic insignia" was "clearly inflammatory"); *State v. Torrez*, 146 NM 331, 339, 210 P3d 228, 236 (2009) (evidence about a gang's culture is only admissible when the state can produce additional "corroborative evidence that the incident was influenced by a gang's code of conduct or other criminal aspects of gang culture"). Although that concern is well founded, we conclude that the trial court acted within its discretion in determining that the state's need for the evidence under these circumstances outweighed the risk of unfair prejudice to defendant.

We also conclude, however, that its admission was harmless. Under Article VII (Amended), section 3, of the Oregon Constitution, an appellate court must "affirm a conviction, notwithstanding any evidentiary error, if there is little likelihood that the error affected the verdict." *State v. Gibson*, 338 Or 560, 576, 113 P3d 423, *cert den*, 546 US 1044 (2005); *see also Davis*, 336 Or at 32. If the particular issue to which the error pertains has "little relationship to the issues being determined by the jury, then there is less likelihood that the error affected the verdict." *State v. Johnson*, 225 Or App 545, 550, 202 P3d 225 (2009). In determining whether the erroneous admission of evidence likely affected the verdict, we look to, among other considerations, whether the evidence in question was cumulative of, or "qualitatively different" than, other admissible evidence. *Davis*, 336 Or at 34. The burden is on the defendant to show that a court's error "affected a substantial right." *State v. Gonzales-Gutierrez*, 216 Or App 97, 107-08, 171 P3d 384 (2007), *rev den*, 344 Or 194 (2008).

Here, defendant has not met his burden of proving that the admission of the Rives evidence likely affected the verdict. Although he argues that the admission of all challenged evidence would induce the jury into believing that he was "a violent, intimidating, obsessed person that they should fear," that is unpersuasive for the same reason that the evidence is irrelevant—the evidence is probative only of Rives's commitment to the gang, not defendant's. Further, any effect that photos of Rives's home and clothing had on the jury was cumulative of, and not qualitatively different than, the other evidence that Vagos members are loyal to their gang. It is unlikely, therefore, that the Rives evidence materially contributed to the jury's assessment of defendant or its determination of his motive or guilt.

In summary, in this case, the trial court did not err in denying defendant's motion to suppress the victim's eyewitness identification because, under *Lawson/James*, the victim's identifications of defendant meet the threshold requirements for admissibility. As for the denial of defendant's motions *in limine* to exclude the two sets of Vagos evidence, we conclude that the trial court did not err in admitting the internet evidence, which was admissible to show

defendant's motive for committing the assault. We conclude that the trial court did err in admitting the irrelevant Rives evidence but that the error was harmless.

Affirmed.