Argued and submitted March 25, 2015, affirmed January 25, petition for review allowed August 3, 2017 (361 Or 800)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

STEVE RAY RIVES,
*Defendant-Appellant.*

Josephine County Circuit Court
10CR0637; A154099

388 P3d 1110

Rankin Johnson, IV, argued the cause and filed the brief for appellant.

James Aaron, Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Ortega, Presiding Judge, and DeVore, Judge, and Wollheim, Senior Judge.

## ORTEGA, P. J.

Defendant appeals a judgment of conviction for third-degree assault, challenging the trial court's denial of his motion to suppress the victim's out-of-court eyewitness identification of defendant. He argues that, under the framework for determining the admissibility of eyewitness identifications established in *State v. Lawson/James*, 352 Or 724, 291 P3d 673 (2012), the trial court should have excluded the victim's identification because it was unreliable and the photo lineup administered by the police was suggestive. He also asserts that, even if the identification met the foundational threshold for admissibility, it should have been excluded under OEC 403 as unduly prejudicial. In *State v. Haugen*, 274 Or App 127, 360 P3d 560 (2015), *rev allowed*, 359 Or 527 (2016), we upheld the admission of the victim's identification of defendant's codefendant. Here, we conclude that the trial court likewise did not err by admitting the victim's eyewitness identification of defendant, which occurred after the same incident and during the same photo lineup that we evaluated in *Haugen*.

We begin with the relevant background facts. Two men assaulted the victim late one night in the parking lot of a bar in Grants Pass. After the victim contacted the police later that night, he told the responding officer that he was unable to provide any information about his assailants other than that they were members of the Vagos Motorcycle Club. Five days later, Detective Brown interviewed the victim. During that interview, the victim explained to Brown what happened that night, including a description of his attackers and, during a sequential photo lineup of known Vagos members, identified defendant as one of his assailants. That interview was recorded and introduced as evidence at a preliminary hearing to determine the admissibility of that eyewitness identification. From that interview, we recount the victim's description of the events leading up to and including the assault, and we recount the details of the photo lineup administered by Brown.

On the night in question, the victim went to a bar in Grants Pass to sing karaoke with two friends. Upon entering

the bar, the victim noticed eight to 10 men (including defendant) in the back of the bar in Vagos Motorcycle Club jackets who were "flying their colors." At some point, a "little fat guy" who was "probably in his 40s" with a "long ponytail" approached the victim and asked him "out of a clear blue sky" if he knew Moore, a former Vagos member. When the victim answered that he did, the "little fat guy" began ranting about Moore, calling him a "scumbag," "rat," and "the lowest form of life on earth." The interaction ended, and the victim continued to sing karaoke with his friends.

Shortly after midnight, as the victim left the bar, "the little fat guy" stood in front of him and asked, "Well, are you here to kick us out?" The victim replied, "No," and noticed Haugen—a "great big stout guy"—standing on the victim's right side. Haugen said to the victim, "Have a good fucking night," then tapped the victim on the shoulder and said, "Walk to your car." Haugen then punched the victim in the side of the head. After the victim fell to the ground, somebody kicked him in the side. The victim explained that "one of the last things" he saw was "the little fat guy" hitting him with a hammer. After the assault, it "[t]ook everything [the victim] had to stand up just to get out of there."

After the victim recounted the details of the assault to Brown, the detective explained that he would show the victim some photographs, which might help identify the "little fat guy." The detective further explained that "this is not necessarily typically the way we do it, but we're going to do it this way this time because of the situation that we're in." He then gave the victim the following instruction:

> "You're about to be shown some photographs. Just because the police officer is showing you these photos, you are in no way obligated to identify anybody, okay? The person who committed the crime may or may not be in this group of photographs. Study the photos carefully before you make any comments or make any decisions.
>
> "* * * * *
>
> "Typically, we just have like six small photographs, but because there's so many people involved in this I'm just going to show you a group of photographs."

Brown began showing the victim a series of 23 photos that were taken from a binder containing Department of Motor Vehicles (DMV) photos of known Vagos members. The photos did not include any notes or names. When Brown showed Haugen's picture to the victim, the victim commented, "This sure looks like the guy that hit me." In response to a question by Brown, the victim clarified that Haugen looked like the assailant who had punched him from the side. The victim indicated that a few more of the pictures showed people who were present at the bar that night, and Brown responded by telling the victim their names or nicknames. Brown pulled out of the notebook the photo of Haugen and the people whom the victim identified as being at the bar. The victim asked how old the photos were, and Brown responded "a couple of years." Brown told the victim he could give the victim "some better descriptors" and provided "current" descriptions of the people in the photos.

When they came to defendant's photo, Brown explained that "[t]his gentleman now has a little bit more gray. I'm talking about 'Six Ball,' or Steve Rives. He's got more gray, but he's got a ponytail that long on his back." The victim responded, "That sure looks like the little fat man right there. He looks different in this. His hair appears darker. But that sure looks like him because he did—his hair was lighter and the ponytail was probably about that long." Brown pulled the photo out and the victim told him, "Yeah, I believe he's one of the ones involved. I wanted to come back to him, but—that's why I asked you when I looked at his picture how old these pictures are." Brown asked, "So you think—and I'm pointing to 'Six Ball,' just to use names, you think this is the short fat guy?" The victim responded, "Yeah, I do." Brown clarified, "And that would be the one that hit you with the ball-peen hammer?" The victim confirmed, "I believe so. Yes."

At that point, the victim indicated to Brown that he was about "80 percent" sure that Haugen and defendant were the ones who had assaulted him. When Brown asked the victim whether he saw defendant "hit [him] with the hammer," the victim stated, "Yeah, I saw it coming. And after that I—it was—I don't remember much after that

except just trying to collect myself and get out of there." After a break in the interview, Brown showed the victim surveillance photos of Vagos members that had been taken a few days before the interview, and the victim immediately identified defendant as the person who hit him with a hammer with "99.9 percent certainty," explaining that "this is definitely the chap here" and "that's exactly how he looked the other night."

Defendant was charged with third-degree assault. His first trial, held in December 2011, ended in a mistrial. In the time between defendant's first and second trials, the Supreme Court issued *Lawson/James*, which devised a framework for determining the admissibility of eyewitness identification evidence. Accordingly, before his second trial, defendant moved to suppress the victim's out-of-court identification of him under the *Lawson/James* framework. The trial court ultimately denied defendant's motion, and the case proceeded to a jury trial, which resulted in defendant's conviction for third-degree assault.

*Lawson/James* established a two-step process. *State v. Hickman*, 355 Or 715, 724, 330 P3d 551 (2014). First, "when a criminal defendant files a pretrial motion to exclude eyewitness identification evidence, the state—as the proponent of the eyewitness identification—must establish all preliminary facts necessary to establish admissibility" under generally applicable provisions of the Oregon Evidence Code. *Lawson/James*, 352 Or at 761. That "foundational" inquiry provides the "minimum baseline of reliability" for eyewitness identifications. *Hickman*, 355 Or at 728. It implicates "three interrelated evidentiary concepts: relevance under OEC 401, personal knowledge under OEC 602, and lay opinion under OEC 701."[1] *Id.* Second, if the state satisfies

---

[1] OEC 602 provides that "a witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness."

OEC 701 provides:

"If the witness is not testifying as an expert, testimony of the witness in the form of opinions or inferences is limited to those opinions or inferences which are:

"(1) Rationally based on the perception of the witness; and

the first step, the burden shifts to the defendant to prove that, under OEC 403, the evidence should nonetheless be excluded. *Id.* at 724.

In *Lawson/James*, the court also identified two categories of factors that have been found to affect the reliability of eyewitness identifications: "so-called 'estimator variables' and 'system variables.'" *Hickman*, 355 Or at 724. Estimator variables "generally refer to characteristics of the witness, the alleged perpetrator, and the environmental conditions of the event that cannot be manipulated or adjusted by state actors." *Lawson/James*, 352 Or at 740. Those variables include:

> "(1) the witness's level of stress; (2) the witness's focus and attention; (3) the duration of exposure to an alleged perpetrator; (4) environmental viewing conditions; (5) the witness's physical and mental characteristics and condition; (6) the witness's description of the perpetrator; (7) the perpetrator's characteristics; (8) the speed of the identification; (9) the witness's confidence or certainty (noted as not reliably indicative of accuracy); and (10) memory decay."

*Haugen*, 274 Or App at 141 (citing *Lawson/James*, 352 Or at 744-46).

On the other hand, system variables relate to "circumstances surrounding the identification procedure itself that are generally within the control of those administering the procedure." *Lawson/James*, 352 Or at 740. Those factors include:

> "(1) whether the identification procedure was conducted by a person who was unaware of the suspect's identity; (2) whether preidentification instructions were given to reduce the likelihood of misidentification; (3) the manner in which the photographic lineup was constructed and presented to the witness; (4) whether multiple viewings of the suspect could have led to source confusion; (5) whether suggestive wording or leading questions by investigators could have contaminated the witness's memory; and (6) whether confirming feedback could have falsely inflated the witness's confidence in the accuracy of his or her identification."

---

"(2) Helpful to a clear understanding of testimony of the witness or the determination of a fact in issue."

*Haugen*, 274 Or App at 141 (citing *Lawson/James*, 352 Or at 741-44). As noted later in this opinion, estimator and system variables can play a role in both steps of the *Lawson/James* framework. *Hickman*, 355 Or at 730-32.

Before discussing the basis of defendant's challenge to the victim's identification, we briefly recap the evidentiary concepts involved in the first step of the *Lawson/James* framework.

Eyewitness identification evidence will almost always meet the basic standard for relevance. *Lawson/James*, 352 Or at 752; *see* OEC 401 (evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of an action more probable or less probable than it would be without the evidence").

When a pretrial challenge to eyewitness identification evidence

> "specifically implicates OEC 602 or OEC 701, those preliminary facts must include, at minimum, proof under OEC 602 that the proffered eyewitness has personal knowledge of the matters to which the witness will testify, and proof under OEC 701 that any identification is both rationally based on the witness's first-hand perceptions and helpful to the trier of fact."

*Lawson/James*, 352 Or at 761-62.

An eyewitness identification satisfies OEC 602 "if the eyewitness testifies to facts that, if believed, would permit a reasonable juror to find that the eyewitness observed the facts necessary to make the identification. Whether the eyewitness actually did observe those facts is a credibility determination for the jury." *Hickman*, 355 Or at 729-30. Estimator variables are relevant to that inquiry, *Haugen*, 274 Or App at 143, but "[s]o-called 'system variables' do not apply to the trial court's OEC 602 determination, because they affect the witness's recollection of her observations, not the observations themselves." *Hickman*, 355 Or at 730.

OEC 701 limits a witness's testimony regarding inferences and lay opinions to those that are "[r]ationally based on the perception of the witness" and "[h]elpful to a

clear understanding of testimony of the witness or the determination of a fact in issue." In eyewitness identification cases, the OEC 701 inquiry requires

> "that the trial court initially consider what the witness actually perceived (essentially, the OEC 602 inquiry described above), and then determine whether the witness's identification of the defendant was 'rationally based' on those perceptions. To satisfy its burden, the proponent of the identification evidence (generally the state) must demonstrate by a preponderance of the evidence that the witness perceived sufficient facts to support an inference of identification and that the identification was, in fact, based on those perceptions."

*Lawson/James*, 352 Or at 754-55. System variables come into play in the OEC 701 inquiry because "when a witness's perceptions support an inference of identification, but are 'nevertheless met with competing evidence of an impermissible basis for that inference' (such as suggestive police procedures), 'an issue of fact arises as to whether the witness's subsequent identification was derived from a permissible or impermissible basis.'" *Haugen*, 274 Or App at 143-44 (quoting *Lawson/James*, 352 Or at 755). In that case, the "trial court must ascertain whether it was more likely than not that the witness's identification was based on his own perceptions." *Id.* at 144. Finally, whether an identification is "helpful" merely requires that the identification "communicates more to the jury than the sum of the witness's describable perceptions." *Lawson/James*, 352 Or at 756.

As noted, once the state satisfies the first step, "the burden shifts to defendant to demonstrate that the danger of unfair prejudice substantially outweighs the identification's probative value" under OEC 403. *Hickman*, 355 Or at 733-34 (quotation marks omitted). System variables "are particularly important under OEC 403 when 'an eyewitness has been exposed to suggestive police procedures.'" *Id.* at 734 (quoting *Lawson/James*, 352 Or at 758). In that instance, the trial court "has a heightened role as an evidentiary gatekeeper because the danger of unfair prejudice increases." *Id.* However, a trial court may exclude an identification under OEC 403 only if the police identification procedures "have been suggestive in one or more ways." *Id.*

In this case, at the hearing to address defendant's motion to suppress the identification, defendant provided the testimony of an expert witness who discussed the variables and how they were put into play in this case. Based in part on that testimony, defendant argued to the trial court that both estimator and system variables supported excluding the victim's identification of defendant. As to the estimator variables, he claimed that the victim was scared, injured, and under a high level of stress during the assault, which came from the "blindside" in a dark parking lot. He pointed out that the victim's attention was likely focused on his first assailant, so any exposure to his second assailant was very brief. Defendant also maintained that the victim told a officer in the immediate aftermath of the assault that he could not identify his assailants because the incident was brief and it was dark out. Finally, defendant argued that he had no particular distinctive characteristics that would make the victim's identification more reliable.

As to the system variables, defendant asserted that the victim's memory was contaminated by the photo lineup procedure used by the police. In particular, he took issue with use of a lineup consisting of only known Vagos members, with no "known innocents." Defendant also claimed that Brown supplied the victim with information during the lineup that may have contaminated the victim's memory and that Brown made suggestive comments during the lineup that may have added a false sense of certainty to the victim's identification.

The court denied defendant's motion, concluding that neither estimator nor system variables required exclusion of the identification evidence. As for estimator variables, the court found the victim to be a credible witness, and noted that, "prior to the assault," the victim was in a well-lit room with "a limited number of people" who were easily identifiable by their Vagos apparel. The court pointed out that the victim had a "face to face" conversation with defendant in the bar, and that the victim had not been drinking alcohol on the night of the incident. The court noted that on the night of the assault, the victim's reluctance to talk to the police was due to being traumatized by the assault, and that "his chance to accurately relate what he saw was much

better five days after than when he talked to [an officer the night of the assault]."

As for system variables, the court determined that, although perhaps unusual, the photo lineup procedure used by the police was appropriate given the circumstances. The court noted that the victim "directed the officer to the Vagos, as opposed to vice versa." The officer gave a standardized instruction before a "blind administration" of the lineup and, given the victim's identification of his attackers as Vagos members, it made sense to "have in the sequential throw downs * * * members of the Vagos, and they were all blue back DMV photographs, could not shed light on the height, really or the weight." The court noted that "it would have been ideal" if the officer "could have found some DMV pictures of the person that was not a Vagos * * * just to make sure that the identification was sound, * * * but it's adequate."

Accordingly, the court concluded that the state proved by a preponderance of the evidence that the eyewitness identification was sufficiently reliable to allow it into evidence. The court noted that it was not unduly prejudicial, and that defendant could "probe the issues regarding estimator variables through cross-examination."

On appeal, defendant reprises his arguments from below, first focusing on "estimator variables" to argue that the victim's eyewitness identification failed to satisfy the personal knowledge requirement of OEC 602. He argues that the victim's observation of his assailants was quick, and occurred at a time when he was scared and tired. Defendant also points out that his observation occurred in a dark parking lot late at night, and the victim's observation of the person who hit him with a hammer occurred while he was lying on the ground *after* he had been "sucker punched." Accordingly, defendant asserts that the circumstances demonstrate that there was a "lack of witness attention" and a "short exposure by the witness" that are "estimator variables" recognized in *Lawson/James* that undermine the conclusion that the victim had sufficient personal knowledge to identify defendant.

We conclude that the state satisfied the personal knowledge requirement of OEC 602 because it adduced

evidence from which a rational juror could find that the victim was able to make observations necessary to make the identification. The victim spoke with defendant earlier in the night in a well-lit bar and, moments before the assault, defendant stood in front of the victim and asked whether the victim was there "to kick us out." The victim also indicated that "one of the last things he saw" was defendant hitting him with a hammer. In addition, before seeing any photos, the victim described defendant's approximate age, physical stature and height, and at least one unique characteristic ("a long ponytail"). Further, the trial court specifically found that the victim had not been drinking alcohol that night, so his senses were not impaired. Based on that evidence, a rational juror could find that the victim had sufficient personal knowledge to identify defendant. As the Supreme Court noted in *Hickman*, once the state adduced such evidence, whether the victim actually had sufficient personal knowledge was a credibility issue that ultimately was for the jury to resolve. 355 Or at 730.

As for the OEC 701 inquiry, defendant asserts that the lineup was suggestive. He claims that the lineup was not blindly administered because Brown knew that the suspects were Vagos members and identified defendant by his given name and nickname to the victim. He also notes that the lineup did not include any "known innocents" and that defendant was the only one pictured who resembled the victim's description of his second assailant. Finally, defendant takes issue with the surveillance photos that were shown to the victim and the "feedback" provided by Brown during the lineup.

We addressed many of the same complaints about the lineup procedure used by Brown in *Haugen*. As we did in that case, we conclude that the victim's identification of defendant satisfied the OEC 701 inquiry. As we noted in *Haugen*, "[w]hen facts indicate that a witness 'could have relied on something other than his or her own perceptions,' the state must establish, by a preponderance of the evidence that the witness's identification was more likely than not the product of his own perceptions." 274 Or App at 147. That "issue of fact" arises only "if there is some evidence that the

witness *could* have based his identification on something other than his own perceptions." *Id.* (emphasis in original).

In *Haugen,* we concluded that, even assuming for the sake of argument that Haugen had sufficiently raised an issue of fact on that issue, it "can reasonably be resolved only in the state's favor." *Id.* We rejected Haugen's arguments that the lineup was not "blindly administered," noting that Brown's objective was to identify suspects and witnesses by having the victim identify members of the Vagos who were present at the bar. *Id.* We also noted that Brown instructed the victim that his assailants might not be included in the group and that, although the lineup procedure differed from a "standard lineup," the procedure used by Brown was "logical" and there was no indication in the record that the lineup's administration steered the victim toward identifying a particular person as his assailant. *Id.* at 147-48. The record also indicated that the victim knew that the purpose of the lineup was to potentially identify his assailants and other possible witnesses, and "[t]hat he was able to identify [Haugen, defendant,] and other individuals present—and the fact that the victim's account was also corroborated by other witnesses—strongly supports the conclusion that the victim's identification of [Haugen] was based on the victim's own perceptions rather than on any deficiency in the identification procedure." *Id.* at 148.

Moreover, in *Haugen,* we rejected the argument that, by showing the victim more recent photos of Haugen and defendant, Brown created a risk of "mugshot exposure," noting that surveillance photos were shown in response to the victim's question about the age of the photos. *Id.* at 149. We observed that "[t]he fact that the victim, without prompting, asked about the age of the photos themselves indicates that the victim recalled his contemporaneous observations with clarity." *Id.* Finally, we rejected the complaint about the "feedback" provided by Brown to the victim during the procedure, concluding that "we do not believe that the record in this case permits a conclusion that Brown's limited 'feedback' unduly influenced the victim." *Id.* at 150. Accordingly, we determined that "any reasonable factfinder would conclude that the victim's identifications of [Haugen] were 'more

likely based' on his 'own perceptions' than on any other factors." *Id.* As for the final part of the OEC 701 inquiry, we "easily conclude[d] that evidence of the victim's identification of [Haugen] as one of his assailants would be helpful to a trier of fact in an assault case." *Id.*

Here, defendant is essentially making the same arguments about the same lineup procedure that we rejected in *Haugen.* And, to the extent there are differences between the arguments made by defendant and the arguments we addressed in *Haugen,* those differences are not significant enough to warrant a different conclusion. For the reasons stated in *Haugen,* we conclude that the victim's identification satisfied the OEC 701 inquiry.

Accordingly, the state presented an adequate foundation under OEC 401, OEC 602, and OEC 701 for admission of the victim's eyewitness identification, and, thus, satisfied the first step of the *Lawson/James* framework.

As for the second step, we review the trial court's determination as to whether defendant demonstrated that the danger of unfair prejudice substantially outweighs the identification's probative value for an abuse of discretion. *Lawson/James,* 352 Or at 762. Here, defendant argues simply that the evidence is unduly prejudicial because "police used an invalid lineup procedure to bolster an invalid identification." In *Hickman,* the court noted that, under OEC 403, "exclusion requires that the state-administered identification procedures have been suggestive in one or more ways." 355 Or at 734. Here, even if we assume for the sake of argument that the lineup procedure used by Brown was suggestive in some way, the trial court was within its discretion to conclude that the danger of unfair prejudice does not substantially outweigh the identification's probative value. That is so because, given our conclusion that any reasonable factfinder would conclude that the victim's identification of defendant was more likely based on his own perceptions than on any suggestive police procedures, any prejudice to defendant was slight, and the probative value (that is, reliabililty) of the victim's identification was high.

Affirmed.